How *v*. Camp; Eldred *v*. Camp; Kelso *v*. Camp.

Walker.
1 w427
86  302

1w  427
e133  ³694

CALVIN W. HOW, FISHER HOW, WILLIAM BAGLEY, SOLOMON WARRINER, BUSHROD BIRCH, HENRY S. WHITTEMORE, HENRY SUYDAM, AND ISAAC H. REED, *v*. SAMUEL CAMP, BOVILLE SHUMWAY AND ABNER W. CAMP.

DANIEL ELDRED *et al. v*. THE SAME DEFENDANTS.

JAMES KELSO *et al. v*. THE SAME DEFENDANTS.

A debtor has a right to prefer one creditor or class of creditors to another, and, on assigning his property for the benefit of creditors, may lawfully require a particular creditor or class of creditors to be paid in full, although his other creditors, in consequence thereof, may not receive any thing.

The denial of fraud by a defendant, in his answer, is not conclusive upon the Court, if the facts and circumstances of the case are such as irresistibly to lead the mind to a different conclusion. When fraud is denied, it is not to be inferred from slight circumstances; but a denial of it does not preclude inquiry, or disarm the Court of its power, when, from the pleadings and proofs, it is satisfied of its existence.

Where a conveyance was actually and not only constructively fraudulent, and a bill was filed by creditors to set it aside, and the grantee was compelled to account for moneys received by him out of the property, it was held that he should be credited with all taxes and improvements made by him, but for no advances made to his grantor, unless the money was used by the latter, before complainants filed their bill, to pay debts due from him at the time he made the fraudulent conveyance.

THE complainants in the first above entitled cause, on October 17th, 1838, recovered the following judgments in the Circuit Court of Hillsdale county, against the defendants, Samuel Camp and Boville Shumway, as partners: Calvin W. How and Fisher How, a judgment for $1,984. 97; William Bagley, a judgment for $871.80; Henry Suydam and Isaac H. Reed, a judgment of $622.37; and Solomon Warriner, Bushrod Birch, and Henry S. Whittemore, a judgment for $1,123.80. April 17th, 1839, writs of *fieri facias* were issued on the several judgments returna-

ble on the third Tuesday of October following, on which day they were returned unsatisfied by the sheriff of Calhoun county, in which county defendants resided. January 27th, 1840, complainants filed their bill setting forth the judgments, executions, and sheriff's return; that the judgments remained unsatisfied; and that complainants had reason to believe, and did believe, Samuel Camp had equitable interests of the value of a hundred dollars and more, which could not be reached by execution. The bill further stated that, on the sixth day of August, 1838, Samuel Camp, to secure to his own use, and to hinder, delay, and defraud complainants and his other creditors, conveyed real estate described in the bill, to his brother Abner W. Camp; and that he, at the same time, for a like purpose, assigned to his brother a promissory note and mortgage for $5,000, dated February 26th, 1836, particularly described in the bill.

Boville Shumway did not appear, and the bill was taken against him *pro confesso.* The Camps appeared, and put in a joint and several answer. They admitted the judgments, &c., but denied Samuel Camp had, at the time of filing the bill, equitable interests, things in action, or other property, of the value of $100. They admitted the conveyance of the real estate, and the assignment of the note and mortgage on the sixth day of August, 1838, but denied all fraud, or intent to hinder, delay, or defraud complainants, or other creditors of Samuel Camp; and stated the deed and assignment were made for the purpose of enabling Samuel Camp to pay his individual creditors. They stated the consideration of the deed and assignment was $7,000, for which Abner executed to his brother his fourteen promissory notes of $500 each, payable with interest, as follows: one in one year, one in two years, one in three years, one in four years, one in five

years, one in six years, two in seven years, one in eight years, two in nine years, one in ten years, one in eleven years, and one in twelve years. That all of the notes had been paid by advances of money, rent, and the like, except the last five, which were assigned by Samuel Camp, January 22d, 1840, to E. Smith Lee, for the benefit of his individual creditors. That Samuel Camp owed individual debts, at the time of the aforesaid conveyance and assignment to his brother, to the amount of $4,000, and that he had paid about $600 of these debts with the money received of his brother. The individual debts mentioned in a schedule attached to the assignment to Lee, amounted to $1,992.75. Replications were filed and testimony taken; but the facts are so fully commented on in the opinion of the Court, as to render it unnecessary to notice them more fully in the statement of the case.

*G. Woodruff*, for complainants.

*A. Pratt*, for defendants.

THE CHANCELLOR. The Camps deny all fraud, and all intention to defraud complainants, or other creditors of Samuel Camp, in the most full and explicit terms; and state the object of the sale was to enable Samuel Camp to provide for the payment of his individual creditors out of his individual property, and to prevent its being sacrificed for the payment of the partnership debts of Camp and Shumway, to pay which the partnership property had been assigned. A debtor has a right to prefer one creditor or class of creditors to another, and, on assigning his property for the benefit of creditors, may lawfully require a particular creditor, or class of creditors, to be paid in full, although his other creditors, in consequence thereof, may not receive any thing. There was nothing, there-

fore, improper in Samuel Camp's selling his individual property to pay his individual creditors, in preference to the partnership creditors of Camp and Shumway. Was the sale to his brother made for that purpose, or for another and different purpose? Was it designed for the benefit of his individual creditors, or intended as a cloak to cover up his property, and keep it from his creditors? This is the point to be determined.

The denial of the fraud by defendants, in their answer, is not conclusive upon the Court, if the facts and circumstances of the case are such as irresistibly to lead the mind to a different conclusion. When fraud is denied, it is not to be inferred from slight circumstances; but a denial of it does not preclude inquiry, or disarm the Court of its power, when, from the pleadings and proofs, it is satisfied of its existence.

The alleged object of the sale was to pay individual creditors, in preference to partnership creditors. This might have been effected in two ways;—by an assignment of the property in trust for creditors generally, giving the individual creditors a preference over the partnership creditors, or by a cash sale of so much of the property as was necessary to pay the individual creditors. One or other of these modes, supposing the individual creditors too numerous to be conveniently secured by separate mortgages, would have suggested itself to the mind of almost any honest debtor. But neither was adopted in the present case, or appears to have been so much as thought of by the Camps, although what they did was done, (to use the language of the answer,) "for the honest and *bona fide* purpose of enabling Samuel Camp to pay and satisfy his individual creditors." They devised a way entirely new and unheard of, for such a purpose;—one as well calculated to hinder and delay creditors in the collection of their

just dues, as could well be invented by the ingenuity of an insolvent debtor;—one which, if sustained by a court of justice, would enable a debtor in failing circumstances to place his property beyond the reach of his creditors, for an almost indefinite length of time, if not secure the enjoyment and benefit of it to himself and family.

The individual debts, according to the answer, amounted to about $4,000; and how is it proposed to secure them? In neither of the ways above suggested. Neither does Samuel Camp make known his wishes to his individual creditors; he gives them no intimation of what he is about to do; he does not consult with them as to what he should do, or how it should be done, or what would be most acceptable to them. He is notoriously insolvent; the firm of Camp and Shumway, of which he was a partner, had already made an assignment for the benefit of the partnership creditors; and he, as the answer states, being fearful the partnership creditors would seize on his individual property, and that nothing would be left for his individual creditors, goes to the state of New York, where he has a brother residing, and conveys all his property to him for $7,000, and takes in payment his brother's fourteen promissory notes, payable, with interest, in from one to twelve years, one each year, except that two are made payable in seven years, and two in nine years. No money is paid down,—not a dollar. No mortgage is taken on the land conveyed, or other security exacted for the payment of the notes, the last of which would not be due under twelve years, and none of them under a year.

If the notes had been paid as they became due, and the money had been faithfully applied by Samuel, it would have required eight years to pay $4,000. Will the law allow an insolvent debtor, under the pretext of giving a preference to certain creditors, to make such a disposition

of his property? If it will, courts of law, with regard to the collection of debts, might as well be abolished at once; for no debtor will permit his property to be sold on execution, if he may sell it to a friend on any length of credit that may be agreed on between them, and thereby prevent its falling into the hands of his creditors. But what was to become of the $3,000 remaining after the individual debts were paid? It was not to go to the creditors of Camp and Shumway; for the reason assigned for selling the property was to prevent its being taken in execution by the partnership creditors.

The deed of the real estate to Abner is not signed by Samuel's wife. It may be said it was executed in the state of New York. That is true, but she is not named in it, and it does not appear she has ever released, or been asked to release her inchoate right of dower. The deed, though executed and acknowledged in the state of New York, was not delivered there, but in Detroit. It bears date on the sixth of August, was acknowledged on the nineteenth, and, three or four days thereafter, was delivered at Detroit, where the sale was consummated. Stopping here, the sale should be declared fraudulent and void as to creditors. Notwithstanding the answer denies any intention to hinder, delay, or defraud creditors, it must be obvious to every one such would be the effect of the deed and assignment, if sustained. It seems to me almost impossible, for men entertaining any thing like correct notions of the moral obligations existing between debtor and creditor, to come to a different conclusion.

The conduct of the parties has not been of such a character, since the sale, as to dispel the cloud hanging over it. Samuel denies that he has, since then, been in possession of all the land conveyed, but admits his possession of the two dwelling houses and store, under an agreement

made at the time. By the agreement he was to have the dwelling houses and store, until the following May. There was no agreement as to the rent, except that he was to pay what should be right. He lived in one of the houses, and the other house and store were in possession of tenants paying rent, which he was to receive. A house to live in was necessary, but the receipt of the rent for the other buildings by him, is a suspicious circumstance. He was to have the rents as the lessee of his brother. They were not to be received by him as agent, nor were they reserved by him when he sold out. The dwelling houses and store, I take it for granted, were the only parts of the property that were at the time productive. There is no positive testimony upon this point, but it is, I think, the only inference to be drawn from the whole case.

About the eighteenth of October, nearly three months and a half after the sale,. it was agreed the rent should be at the rate of $500 a year, over and above the taxes, which were to be paid by Samuel. At this time it was also agreed Samuel should have the premises for one year from the first of May, 1839, a lease was executed, and the year's rent paid in advance, by delivering up the $500 note payable in two years. This lease has not been produced by defendants. On the seventeenth day of the same month, complainants obtained their judgments.

About this time, Abner advanced to Samuel $21,000 in cash, and cancelled a debt of $500 cash advanced for him a few days before, and, in consideration thereof, Samuel gave up seven of the $500 notes.

On the tenth of September, 1839, the first $500 note was paid. This note, though the first to become due, was not paid until eight of the notes falling due long after it, had been taken up. The answer states it was paid as follows : $100 in cash, a note for $150, dated July

12th, 1839, payable in a year, with interest, and the rent of the premises up to May 1st, 1839. The rent due on the first of May, at $500 a year, being nine months, lacking six days, was $367, which, added to the $250, cash and note, would make $617, instead of $538, the amount of the $500 note, including interest.

With the $2,400 cash, Samuel paid about $600 of his individual debts, and the balance was spent in supporting himself and family. Four thousand five hundred dollars of the notes were used up in paying $600 of individual debts, and supporting himself and family a year and nine months.

On the twenty-second of January, 1840, Samuel assigned the remaining five notes to E. Smith Lee, for the benefit of his individual creditors. This was after the Eldreds had filed their bill.

The $5,000 mortgage was foreclosed at law by advertisement, and the mortgaged premises, consisting of seven eighty-acre lots, bid off by Abner, December 28th, 1838, for what was due on the mortgage. Three of these lots were afterwards sold by him, July 9th, 1839, to Samuel Sharpsteen, for $1,350; and, on the eleventh day of the same month, he mortgaged two of the village lots in Marshall to Jonathan Hedges, for $2,400.

On May 4th, 1840, he appointed Herman Camp, a young man, but twenty-one years of age, and a son of Samuel Camp, his attorney, to sell, and convey or lease, the whole or any part of the premises, and to make, execute, and acknowledge deeds, &c. On May 14th, 1841, a year after, when Herman was examined as a witness, no account had been rendered by him to his uncle, but he stated he expected to account to him for all moneys he had received and paid out. He had, in the mean time, paid his

father $162 of the rents, for materials furnished, and repairs made by him on the premises.

A mortgage, executed by Samuel and his wife to one Cleveland, a few months previous to the sale, on a part of the premises, Samuel caused to be discharged in the summer of 1839.

The answer states the whole consideration was $7,000. The deeds state a consideration of $6,000, and the assignment of the mortgage a consideration of $5,000, making together $11,000.

Other circumstances might be mentioned, but I do not deem it necessary, as I entertain no doubt of the true character of the transaction, and of my duty to declare the sale fraudulent and void as to the creditors of Samuel Camp.

A decree must be entered declaring the deed and assignment to Abner W. Camp, fraudulent and void, as against complainants, except as to the premises sold to Sharpsteen, and the Hedges' mortgage, which are not to be affected by the decree. And a receiver must be appointed, with the usual powers of a receiver on a judgment creditor's bill, to whom Abner W. Camp must convey, by deed, the premises conveyed to him by Samuel, and the premises described in the mortgage assigned to him, except the part sold to Sharpsteen,—the decree to vest the receiver with the title of the premises to be conveyed, and to stand in the place, and have the effect of such conveyance, until a conveyance is duly executed and delivered. Possession of the premises must be delivered to the receiver, and Abner W. Camp must account to the receiver before a Master, who must make out and state the account, for the purchase money received of Sharpsteen, with interest, and for the amount due at the time of taking the account, on the Hedges' mortgage, and the rents and profits received

by him or his agent, and be credited with all taxes paid and improvements made by him, but for no advances of money to Samuel, unless the money was used by Samuel, before complainants filed their bill, to pay debts due from him at the time he conveyed to Abner.  So far as such payments are concerned, the conveyance to Abner has not operated as a fraud on creditors, or to the prejudice of the rights or preference acquired by complainants on filing their bill, and should therefore be allowed in the account.  But no other advances of money to be allowed; for this is not a case of constructive, but of positive fraud against creditors, in which the grantee is *particeps crimi-nis.*  When that is the case, the rule is not to allow the grantee, in taking an account, for any advances made to the grantor, as it would, to the extent of such allowance, be giving effect to the fraud, and remove the chief obstacle to third persons' assisting debtors in defrauding their creditors, by indemnifying them against pecuniary loss in case of detection.  *Sands* v. *Codwise,* 4 *J. R.* 536, 598; *Boyd* v. *Dunlap,* 1 *J. C. R.* 482; *Bean* v. *Smith,* 2 *Mass. R.* 252.  And Abner Camp must pay the amount found due from him to the receiver.  Complainants to receive their costs.

The same decree must be entered in the other two causes.